UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

INTER-AMERICAN DEVELOPMENT BANK,  :
                                  :
                 Plaintiff,       :
                                  :
         v.                       :        Index No. 15-cv-04063
                                  :
VENTI S.A. and INDUSTRIAS METALÚRGICAS :
PESCARMONA S.A.I.C. y F.,          :
                                  :
                 Defendants.      :
                                  :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


**PLAINTIFF INTER-AMERICAN DEVELOPMENT BANK'S
MEMORANDUM IN SUPPORT OF ITS MOTION TO ENFORCE JUDGMENT,
<u>APPOINT RECEIVER AND ISSUE PERMANENT INJUNCTION</u>**


RICHARDS KIBBE & ORBE LLP
David W. T. Daniels (ddaniels@rkollp.com)
Jeffrey A. Lehtman (jlehtman@rkollp.com)
Portrait Building, 701 8th Street, N.W.
Washington, DC  20001-3727
Tel:  (202) 261-2960

Katherine Kern Harrington (kharrington@rkollp.com)
Maria E. Lapetina (mlapetina@rkollp.com)
200 Liberty Street
New York, New York 10281-1003
Tel:  (212) 530-1800

*Attorneys for Plaintiff Inter-American Development Bank*

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT .................................................................................................... 1

FACTUAL BACKGROUND ...................................................................................................... 3

I.   THE PARTIES .................................................................................................................. 3

II.  ORIGIN OF THE DISPUTE ............................................................................................ 3

III. THE IDB'S LAWSUIT TO ENFORCE THE GUARANTEES ...................................... 4

IV.  THE IDB'S JUDGMENT COLLECTION EFFORTS ..................................................... 6

ARGUMENT ................................................................................................................................ 9

I.   THE COURT SHOULD ORDER DEFENDANTS TO PAY THE IDB .......................... 9

II.  THE COURT SHOULD ORDER IMPSA TO DELIVER AND ASSIGN ITS
     CORPOELEC CONTRACT RIGHTS TO A RECEIVER ............................................ 11

     A.   IMPSA's Corpoelec Contract Rights .................................................................. 12

     B.   The Court Should Appoint A Receiver Who Can Realize
          Upon The Corpoelec Contract ............................................................................ 15

III. THE COURT SHOULD ISSUE AN INJUNCTION PROHIBITING
     DEFENDANTS FROM INTERFERING WITH THESE ORDERS .............................. 17

CONCLUSION ............................................................................................................................ 19

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*ABKCO Indus. v. Apple Films*,
   39 N.Y.2d 670 (1976) ................................................................................................14

*CIMC Raffles Offshore (Singapore) Ltd. v. Schahin Holding S.A.*,
   942 F. Supp. 2d 425 (S.D.N.Y. 2013) .......................................................................10

*Coscia v. Eljamal*,
   8 N.Y.S.3d 882 (N.Y. Sup. Ct. 2015) ........................................................................15

*Entergy Nuclear Vt. Yankee, LLC v. Shumlin*,
   733 F.3d 393 (2d Cir. 2013) .......................................................................................18

*Gasser Chair Co., Inc. v. Infanti Chair Mfg. Corp.*,
   No. 03 CV 6413 (ILG), 2006 WL 297451 (E.D.N.Y. Feb. 8, 2006) .........................16

*Grupo Mexicano de Desarrollo S.A. v. All. Bond Fund, Inc.*,
   527 U.S. 308 (1999) ....................................................................................................17

*Gryphon Domestic VI, LLC v. APP Int'l Fin. Co., B.V.*,
   836 N.Y.S.2d 4 (1st Dep't 2007) .....................................................................10, 11, 17

*Hotel 71 Mezz Lender LLC v. Falor*,
   14 N.Y.3d 303 (2010) .......................................................................................14, 15, 16

*In re Gaming Lottery Sec. Litig.*,
   No. 96 CIV. 5567, 2001 WL 123807 (S.D.N.Y. Feb. 13, 2001) ...............................14

*Motorola Credit Corp. v. Uzan*,
   739 F. Supp. 2d 636 (S.D.N.Y. 2010) .............................................................12, 14, 15

*Motorola Credit Corp. v. Uzan*,
   978 F. Supp. 2d 205 (S.D.N.Y. 2013) .......................................................................19

*NML Capital, Ltd. v. Republic of Argentina*,
   699 F.3d 246 (2d Cir. 2012) .................................................................................18, 19

*NML Capital, Ltd. v. Republic of Argentina*,
   727 F.3d 230 (2d Cir. 2013) .......................................................................................17

*P-C Palladio, LLC v. Nassi*,
   No. 13 MC. 234, 2014 WL 584315 (S.D.N.Y. Feb. 14, 2014) ..................................10

*Pashaian v. Eccelston Props., Ltd.*,
   88 F.3d 77 (2d Cir. 1996) ...........................................................................................19

*Spotnana, Inc. v. Am. Talent Agency, Inc.*,
   No. 09 CIV. 3698 LAP, 2013 WL 227546 (S.D.N.Y. Jan. 22, 2013) .............................15, 16

*State Farm Mut. Auto. Ins. Co. v. Am. Rehab And Physical Therapy, Inc.*,
   376 F. App'x 182 (3d Cir. 2010) ............................................................................................19

*United States v. Vulpis*,
   967 F.2d 734 (2d Cir. 1992).....................................................................................................16

*Yukos Capital S.A.R.L. v. OAO Samaraneftegaz*,
   No. 10 CIV. 6147 PAC, 2014 WL 81563 (S.D.N.Y. Jan. 9, 2014)........................................18

STATUTES

N.Y. C.P.L.R. 5201 ......................................................................................................................14

N.Y. C.P.L.R. 5225 ................................................................................................................. passim

N.Y. C.P.L.R. 5228 ................................................................................................................12, 15

RULES

Federal Rules of Appellate Procedure 4 .........................................................................................8

Federal Rules of Civil Procedure 65 ......................................................................................17, 18

Federal Rules of Civil Procedure 66 ............................................................................................15

Plaintiff Inter-American Development Bank (the "IDB"), having obtained a money judgment against defendants Venti S.A. ("Venti") and Industrias Metalúrgicas Pescarmona S.A.I.C. y F. ("IMPSA," and collectively, "Defendants"), submits this Memorandum in Support of its Motion to Enforce Judgment, Appoint Receiver and Issue Permanent Injunction.

## PRELIMINARY STATEMENT

The IDB respectfully requests the Court's assistance to enforce the judgment issued against Defendants in this matter.  Such assistance is necessary because Defendants have failed to take any steps to satisfy that judgment.  Defendants are each headquartered in Argentina and have affiliates and operations throughout the world.  Although Defendants admit in their most recent public financial statements that they are currently in possession of enough cash and other property to satisfy the judgment, they largely hold those assets off-shore and have not taken steps to repay the obligations owed to the IDB.  Defendants have refused to comply with discovery demands, recently leading this Court to issue an order compelling them to do so.  Further, the IDB is concerned that Defendants may be transferring property off-shore in potential violation of N.Y. C.P.L.R. 5222 which prohibits from doing so without this Court's permission.

The IDB has vigorously pursued judgment enforcement proceedings against Defendants and their assets.  The IDB has sought discovery and has executed upon judgment debtor assets located in the United States.  The IDB has also initiated a lawsuit to have this Court's judgment recognized in Argentina and will be pursuing all available remedies in that jurisdiction and elsewhere.  However, Defendants' sprawling international footprint and its refusal to permit discovery creates uncertainty as to the IDB's ability to satisfy the judgment absent additional relief from this Court.  The IDB therefore requests that the Court exercise its statutory and equitable powers to order Defendants to take the following steps to satisfy the judgment.

First, the Court should enter an order instructing Defendants to immediately pay to the IDB the amount of ARG$73.5 million.  According to IMPSA's most recent published financial statements, Defendants presently possess this amount in cash and cash equivalents.  N.Y. C.P.L.R. 5225(a) authorizes this Court to order Defendants to pay all money in their possession wherever that money is held.  All such cash should immediately be paid to the IDB.

Second, the Court should enter an order appointing a receiver and instructing Defendants to assign to that receiver certain contractual rights to payment.  IMPSA is presently a party to valuable construction contracts with the state-owned power generation company for the Republic of Venezuela ("Corpoelec").  According to its financial statements, IMPSA is due to receive from Corpoelec payments in an amount that could satisfy the outstanding judgment.  Applicable state and federal law authorizes the Court to appoint a receiver to collect and realize upon that contractual interest so as to maximize the value of recovery.  Under N.Y. C.P.L.R. 5225(c) and 5228, the Court may order IMPSA to assign all rights to payment under the Corpoelec contract to an appointed receiver for collection.

Third, the Court should enjoin Defendants, their affiliates and those acting in concert with them from taking any steps to cause payments under the Corpoelec contract to be made to anyone other than the receiver.  The Court should similarly enjoin Defendants, their affiliates and those acting in concert with them from transferring cash in Defendants' possession to any person other than the IDB absent Court permission.  Such an injunction is necessary here to enforce compliance with U.S. law.  Without such an injunction, the IDB will be irreparably harmed.

In inducing the IDB to extend the $150 million loan giving rise to this lawsuit – a loan from which Defendants benefitted – Defendants specifically undertook to be bound by New York law in connection with each of their guarantees.  The Court should hold them to that

promise by using the tools available under New York law to ensure satisfaction of the judgment in full.

## FACTUAL BACKGROUND

### I.     THE PARTIES

The IDB is an international lending institution owned by its forty-eight member countries, including the United States.  Dkt. 26 (Declaration of Hans Schulz in Support of Motion for Summary Judgment) ("Schulz Decl.") ¶ 1.  The purpose of the IDB is to further, through its financing activities, the economic and social development of Latin America and the Caribbean.  *Id.*  The IDB provides critical financial support for projects throughout the region, including projects to alleviate poverty, promote education, address climate change and improve renewable energy resources.  *Id.*  The IDB uses the proceeds from its lending to reinvest in new projects in furtherance of its purpose.  *Id.*

Venti and IMPSA are affiliates.  They are both headquartered in Argentina.  The two companies are part of a large, international corporate structure, owned and managed in large part by a single family – the Pescarmonas.  Declaration of Katherine Kern Harrington in Support of Motion to Enforce Judgment ("Harrington Decl."), ¶¶ 2-4, Exs. A-C.  Venti and IMPSA have affiliates and subsidiaries all over the world, including in South America, Europe and Asia.  *Id.*  IMPSA has also issued debt to the public and is therefore regulated by the Comisión Nacional de Valores ("CNV"), which is the securities regulator for Argentina.  *Id.* ¶ 4, Ex. C.

### II.     ORIGIN OF THE DISPUTE

On December 9, 2011, the IDB entered into a loan facility with Wind Power Energia, S.A. ("WPE").  Dkt 26-1 (Schulz Decl. Ex. A).  At the time, WPE was a wholly-owned subsidiary of IMPSA.  Schulz Decl. ¶ 3.  Pursuant to the terms of the loan agreement, WPE was permitted to borrow up to $150 million from the IDB.  *Id.* ¶ 4.

At the time the loan was issued, IMPSA signed an unconditional guarantee to repay the loan in the event of any payment default. Dkt. 26-2 (Schulz Decl. Ex. B). Pursuant to the terms of the guarantee, IMPSA agreed to "irrevocably and unconditionally submit[] to the non-exclusive jurisdiction of the courts of . . . the United States of America District Court of the Southern District of New York." *Id.* at 17(b). Under the contract, IMPSA also agreed to maintain an agent for service of process in the United States and irrevocably designated CT Corporation to serve as that agent. *Id.* at 17(d).

IMPSA reorganized its corporate structure in 2014. Schulz Decl. ¶ 6. WPE was placed under a new corporate holding company, Venti. *Id.* The loan agreement anticipated this potential restructuring and required that, in the event of a corporate restructuring, WPE's new parent company execute an unconditional guarantee. Dkt. 26-1 (Schulz Decl. Ex. A). In satisfaction of the terms of the loan agreement, Venti entered into a separate unconditional guarantee on January 30, 2014. Dkt. 26-3 (Schulz Decl. Ex. C). Like IMPSA, Venti submitted itself to jurisdiction in New York: "[Venti] hereby irrevocably and unconditionally submits to the non-exclusive jurisdiction of the courts of . . . the United States of America District Court for the Southern District of New York." *Id.* at 17(b). And like IMPSA, Venti also irrevocably appointed CT Corporation as its agent for service of process. *Id.*

## III.    THE IDB'S LAWSUIT TO ENFORCE THE GUARANTEES

WPE ultimately borrowed the entire $150 million under the loan agreement in two tranches, each of which was memorialized by a promissory note. Schulz Decl. ¶ 8; Dkt. 26-4 (Schulz Decl. Ex. D). WPE was, therefore, obligated to repay the entire $150 million principal amount. Schulz Decl. ¶¶ 7-8. WPE was additionally required to make semiannual interest payments. *Id.* ¶ 10. WPE made the first five required interest payments from February 15, 2012 through February 15, 2015. *Id.* On August 15, 2014, however, WPE failed to make a $4.4

4

million interest payment and thereby defaulted on the loan.  *Id.* ¶¶ 10-11.  The IDB sent WPE a notice of default on August 20, 2014.  *Id.*; Dkt. 26-6 (Schulz Decl. Ex. F)  WPE failed to cure its breach, prompting the IDB to trigger the acceleration option under the loan agreement.  Schulz Decl. ¶ 11; Dkt. 26-7 (Schulz Decl. Ex. G).  On August 27, 2014, the IDB notified WPE that it was accelerating the loan and demanded payment of the entire amount due and owing under the loan.  *Id.*  WPE made no additional payments.  Schulz Decl. ¶ 12.

The IDB then turned to Venti and IMPSA for repayment under the guarantees.  Under the terms of their respective guarantee agreements, both Venti and IMPSA "unconditionally guarantee[d] to IDB, as a primary obligor and not merely as a surety, the due and punctual payment and performance of the Guaranteed Obligations."  Dkt. 26-2 at § 2(a) (Schulz Decl. Ex. B); Dkt. 26-3 at § 2(a) (Schulz Decl. Ex. C).  Both guarantees define "Guaranteed Obligations" as "the due and punctual payment by the Borrower of (i) the principal of and premium, if any, and interest . . . on the Loan, when and as due, whether at maturity, by acceleration, upon one or more dates set for prepayment or otherwise, and (ii) all other monetary obligations, including fees, costs, expenses and indemnities . . . of the Borrower pursuant to the Loan Agreement."  Dkt. 26-2 at § 2; Dkt. 26-3 at § 2.  Neither guarantor has made any payments to the IDB in breach of their respective guarantees.

On May 27, 2015, the IDB filed this lawsuit to enforce the guarantees.  Dkt. 1.  The IDB served IMPSA and Venti through their registered agent for service of process in New York on May 28, 2015.  Dkts. 4, 5.  Although not contractually required, the IDB separately served each Defendant under the Hague Service Convention.  Dkt. 28.  Venti and IMPSA each appeared to defend the lawsuit and acknowledged that they had been properly served with the summons and complaint on May 28, 2015.  Dkt. 10 ("The agreement between Plaintiff and Defendants at issue in this litigation designates CT Corporation as Defendants' agent for service.  CT Corporation was

served with the Summons and Complaint on May 28, 2015.  Therefore, under Rule 4(e) and 4(h), service is complete.").  They retained New York counsel and filed an answer on July 6, 2015. Dkt. 17.  Counsel for IMPSA and Venti appeared for an initial pretrial conference on July 20, 2015.  Dkt. 22.  Following the initial pretrial conference, both Defendants engaged in discovery efforts, and propounded and responded to interrogatories and document requests.  Dkt. 27, Declaration of Maria E. Lapetina in Support of Motion for Summary Judgment ("Lapetina Decl.") ¶ 4-5; Dkts. 27-4 - 27-7 (Lapetina Decl. Exs. C-F).

On August 28, 2015, the IDB moved for summary judgment on its claim.  Dkt. 24. Although Venti and IMPSA had negotiated a briefing schedule for that motion during an initial pretrial conference, Defendants filed no opposition to the IDB's motion by the applicable Court-ordered deadline.  Dkt. 29-1.  By email, their counsel confirmed that they would not be filing an opposition, and this Court subsequently granted the motion in full.  *Id.*; Dkt. 30.  In doing so, the Court noted that the IDB's "submissions establish plaintiff's entitlement to summary judgment." Dkt. 30.  After adjusting the judgment to account for accrued interest, the Court entered a final judgment in the amount of $168,172,809.92.[1]  Dkt. 33.

## IV.    THE IDB'S JUDGMENT COLLECTION EFFORTS

Since entry of the judgment, the IDB has been diligent in its search for assets.  On September 25, 2015, the IDB served document requests on Defendants pursuant to Fed. R. Civ. P. 26 and 34 and also served notices for depositions pursuant to Fed. R. Civ. P. 30(b)(6). Harrington Decl. ¶¶ 5-7, Exs. D-F.  Defendants failed to respond to the IDB's document requests

---

[1] On September 30, 2015, the IDB moved to amend the judgment in the amount of $909,459.57 to recover attorneys' fees and other litigation expenses.  Dkt. 35.  Defendants have not opposed this motion.  That motion remains pending.

despite repeated demands that they do so.  *Id.* ¶ 7.  As for depositions, Defendants have refused to make any witnesses available.[2]  *Id.* ¶¶ 5-6.

On December 18, 2015, the IDB filed a letter brief requesting an order compelling the production of documents and the designation of deposition witnesses.  Dkt. 53.  The Court granted that request and ordered Defendants to produce documents by January 6, 2016 and designate and make available representatives for deposition by January 20, 2016.  Dkt. 54.  The IDB promptly delivered a copy of this order to Defendants' General Counsel.  Harrington Decl. Ex. BB.  The IDB has received no response to date.

Separately, the IDB has taken steps to prevent Defendants from dissipating assets through sale or transfer.  On October 5, 2015, the IDB delivered N.Y. C.P.L.R. 5222 restraining notices on IMPSA's and Venti's then counsel of record.  *Id.* ¶¶ 8-9.  Those notices each advised Defendants that they were forbidden to make any sale, assignment or interference with their property – absent Court permission – until the judgment is satisfied.  The IDB separately served restraining notices and subpoenas on various banking and financial institutions in order to identify assets and to freeze them so as to prevent any transfers, and has executed upon certain assets in the United States.  The IDB has also pursued efforts to enforce the judgment overseas.[3]

On November 30, 2015, certain IMPSA and IDB representatives met to discuss the pending dispute.  Harrington Decl. ¶ 11, Ex. J.  During those discussions, IMPSA's representatives stated that as a result of this litigation, IMPSA and its affiliates have been forced to transfer assets from various bank accounts in order to pay their vendors and suppliers.  *Id.*

---

[2] Defendants' previous counsel moved to withdraw as counsel on October 6, 2015.  Dkt. 42.  In response, the Court ordered that they continue as counsel for one month and asked Defendants to retain new counsel by November 3, 2015.  Dkt. 45.  Neither Venti nor IMPSA has done so.
[3] Among other things, the IDB filed a petition on October 30, 2015 to have the judgment recognized in Argentina.  Harrington Decl. ¶ 10, Ex. I.  That action remains pending.

Concerned that such transfers were contrary to Defendants' obligations under N.Y. C.P.L.R. 5222, the IDB raised the issue with Defendants' General Counsel in a letter dated December 4, 2015, asking Defendants to explain the steps they have taken to comply with applicable legal requirements.  Harrington Decl. ¶ 11, Ex. J (emphasis in original).  Defendants made no response to this letter or to a follow-up letter sent on December 15, 2015.  *Id.* ¶¶ 11-12.

Instead of making efforts to satisfy this Court's judgment, Defendants have been attempting to persuade their various creditors to agree to a judicially-supervised debt restructuring in Argentina – a process requiring the consent of a certain percentage of their creditors.  It appears that Defendants may be attempting to solicit support for their preferred proposal without accurate disclosure of all material facts.  For example, on November 26, 2015, IMPSA filed a notice with the CNV, the Argentine securities regulator, referencing the proposed debt restructuring.  The notice purported to describe the status of this litigation, representing that "such litigation is still pending resolution as the acknowledgment of the foreign ruling provided for in the applicable procedural law has not been executed yet."  Harrington Decl. ¶¶ 13-14, Exs. L-M.  This description of this litigation was materially incomplete.  In particular, there was no disclosure that the time to appeal this Court's judgment had expired and that the judgment was therefore final rather than "still pending resolution."  Fed. R. App. P. 4(a)(1)(A).

On December 14, 2015, an article regarding the proposed restructuring was published in Argentine newspaper that was evidently sourced from Defendants and that specifically quoted certain of Defendants' officers.  The article represented that Defendants had "closed a private agreement" with a group of creditors regarding a restructuring and that "such negotiation … [included] the IDB …."  Harrington Decl., Exs. DD-EE.  The statement was false and misleading

when made because the IDB has not reached any such agreement.  The IDB is not aware that Defendants have ever taken steps to correct this misleading public statement.

On December 23, 2015, Defendants issued a press release reporting that they had filed a "copia del Resumen de Terminos y Condicones" (i.e., a summary of terms and conditions for the proposed debt restructuring) with a bankruptcy court in the Province of Mendoza.  Harrington Decl. Ex. CC].  The press release did not state that Defendants had secured approval of the required percentage of creditors for an out-of-court restructuring under Argentine law.  To the best of Defendants' knowledge, such creditor approval has not yet been obtained.

In sum, Defendants appear to be ignoring their existing obligations to this Court while attempting to solicit – through improper means – support for their preferred restructuring strategy in Argentina.  The Court should ensure full compliance with U.S. law by ordering the relief set forth below.

## ARGUMENT

## I.  THE COURT SHOULD ORDER DEFENDANTS TO PAY THE IDB.

As an initial matter, the Court should order Defendants to immediately pay to the IDB the sum of ARG$73.5 million (which is currently equal to approximately USD$5.63 million).  New York law specifically authorizes this Court to order the payment of money held by a defendant upon a showing that the judgment debtor is in possession of such money:

> Upon motion of the judgment creditor, upon notice to the judgment debtor, where it is shown that the judgment debtor is in possession or custody of money, . . . the court *shall* order that the judgment debtor pay the money . . .  to the judgment creditor.

N.Y. C.P.L.R. 5225(a) (emphasis added).[4]

---

[4] Fed. R. Civ. P. 69(a)(1) states that "[t]he procedure on execution – and in proceedings supplementary to and in aid of judgment or execution – must accord with the procedure of the state where the court is located, but a federal statute governs to the extent is applies."  N.Y.

Defendants admit in their own recently published financial statements that they are currently in possession of money that is subject to this statute.  IMPSA issued audited financial statements on November 12, 2015, which represented that they were accurately setting forth the company's condition as of September 30, 2015.  Harrington Decl. ¶ 14, Exs. N-O.  Those financial statements disclose that IMPSA has cash and cash equivalents in the amount of ARG$73.5 million pesos.  *Id.*  Specifically, Note 3 of the financial statements indicates that IMPSA currently has ARG$73.112 million in cash and a total of ARG$424,000 in fixed-term deposits.  *Id.*

Under N.Y. C.P.L.R. 5225(a), the Court should order all such moneys to be paid to the IDB.  *P-C Palladio, LLC v. Nassi*, No. 13 MC 234, 2014 WL 584315, at *6 (S.D.N.Y. Feb. 14, 2014) order vacated in [unrelated] part, No. 13 MC 234, 2014 WL 1316354 (S.D.N.Y. Apr. 2, 2014) (granting turnover of money where there is "no genuine dispute that Judgment Debtor has an interest in, and is in possession of, the cash").  In issuing such an order, it is irrelevant that the money in question may be located outside of the United States.  Where, as here, the Court has jurisdiction over Defendants, it can order them to pay that money into the United States.  *Gryphon Domestic VI, LLC v. APP Int'l Fin. Co.*, *B.V.*, 836 N.Y.S.2d 4, 9 (1st Dep't 2007) (affirming New York precedents under which "defendant judgment debtors could be ordered to turn over out-of-state assets to a New York sheriff."); *CIMC Raffles Offshore (Singapore) Ltd.*, 942 F. Supp. 2d at 427 (S.D.N.Y. 2013) (finding that "this Court may properly direct, and hereby so orders, [judgment debtors] to bring into New York and turn over to [plaintiff] funds sufficient to satisfy the judgment issued against them").

---

C.P.L.R. 5225(a) is incorporated through this rule.  *CIMC Raffles Offshore (Singapore) Ltd. v. Schahin Holding S.A.*, 942 F. Supp. 2d 425, 427 (S.D.N.Y. 2013).

The New York Appellate Division – First Department, in similar circumstances, reversed a lower court's holding that "a turnover order pursuant to N.Y. C.P.L.R. 5225(a) cannot reach property outside New York," finding it to be "in error." *Gryphon*, 836 N.Y.S.2d at 9.  Like this lawsuit, the *Gryphon* case involved a claim against a guarantor who was located outside of the United States. *Id.* at 6.  The *Gryphon* court held that, because it had personal jurisdiction over the defendant, it could direct the defendant to bring property into New York to satisfy the judgment against it, and that its ability to do so did not depend on whether the property had at any point been located in and removed from New York. *Id.* at 9.

Following N.Y. C.P.L.R. 5225 and case law interpreting it, the Court should therefore order Defendants to pay ARG$73.5 million to the IDB.

## II.   THE COURT SHOULD ORDER IMPSA TO DELIVER AND ASSIGN ITS CORPOELEC CONTRACT RIGHTS TO A RECEIVER.

Next, the Court should order IMPSA to assign certain valuable contract rights to a Court-appointed receiver for collection.  In addition to empowering this Court to order a turnover of cash and cash equivalents to the IDB, N.Y. C.P.L.R. 5225(a) further provides that the Court may order Defendants to turn over property to an appropriate custodian who can then realize upon that property to satisfy the judgment.  Specifically, the statute provides that, where payable money is "insufficient to satisfy the judgment," the Court *shall* order a judgment debtor "to deliver any other personal property, or so much of it as is of sufficient value, to a designated sheriff."  N.Y. C.P.L.R. 5225(a).  In order "to effect payment or delivery" of such personal property, the Court may order the judgment debtor to "execute and deliver any document necessary to effect [such] delivery."  N.Y. C.P.L.R. 5225(c).  Such documents may include an assignment of rights. *Motorola Credit Corp. v. Uzan*, 739 F. Supp. 2d 636, 641 (S.D.N.Y. 2010) (assigning judgment debtor's arbitration claim to judgment creditor).  Where appropriate, the

Court may "mak[e] an order . . .  directing that . . .  delivery [] be made to [an appointed] receiver rather than to a sheriff."  N.Y. C.P.L.R. 5228.

The Court should utilize its statutory authority to appoint a receiver and order Defendants to assign certain contract rights to that receiver for collection.  Those contract rights relate to construction contracts entered into by IMPSA with Corpoelec, the state-owned power generation company for the Republic of Venezuela.

### A.    IMPSA's Corpoelec Contract Rights.

IMPSA has had a contractual relationship with Corpoelec or certain of its predecessor entities to help construct Venezuela's power grid since at least 2007.  Harrington Decl. ¶ 20, Exs. U-V.  IMPSA has undertaken several substantial projects pursuant to that relationship.  For example, IMPSA entered into a contract dated January 18, 2008, pursuant to which IMPSA agreed to assist with the construction of the Tocoma Hydropower Plant in Estado de Bolívar, Venezuela.  *Id.*  As IMPSA itself describes the project, Tocoma is "a key project in Corpoelec's plans to provide secure and efficient energy to Venezuela's national power grid in a profitable manner."  *Id*. ¶ 15, Ex. P.  The project requires IMPSA to assist with "the construction of a spillway with radial gates and the corresponding closing dams."  *Id.*  In connection with this project, Corpoelec contracted IMPSA to manufacture ten hydraulic turbines (the first of which IMPSA installed in 2012) as well as governors, generators, and automation and control systems for the project.  *Id.* ¶ 16, Ex. Q.  Since January 2008, the parties have executed at least five contract addenda, the last of which was executed on July 10, 2015.  *Id*. ¶ 21, Exs. W-AA.  The July 10, 2015 addendum contemplates IMPSA's continued assistance through June 3, 2019.  *Id.*, Ex. Y.

Apart from the Tocoma project, IMPSA entered into a subsequent agreement with Corpoelec in connection with the Macagua Hydropower plant, located in Puerto Ordaz,

Venezuela. *Id.* ¶ 17, Ex. R.  Pursuant to this contract, IMPSA agreed to provide for the "rehabilitation and refurbishment of a hydroelectric power plant, and supply of high complexity hydraulic and electromagnetic laboratories" at Macagua.  *Id.*

IMPSA entered into a third contract with Corpoelec, dated December 17, 2010, to develop a wind farm in the state of Zulia, Venezuela.  *Id.* ¶ 14, Exs. N, O.  Under the terms of this contract, IMPSA has agreed to provide services in connection with the La Guajira Project in two phases.  *Id.*  During the first phase, IMPSA contracted to provide and maintain 12 wind turbines, and during the second phase, IMPSA agreed to provide 24 additional wind turbines. *Id.; Id.* ¶ 18, Ex. S.

Corpoelec currently owes IMPSA payments under these contracts that would more than satisfy the full amount of the judgment owed to the IDB.  Specifically, IMPSA's audited financial statements list ARG$2,830,049,000 in accounts receivable.  *Id.* ¶ 14, Exs. N-O.  Of this amount, "78.99%[5] of the outstanding receivables as of September 30, 2015, are derived from contracts with Corpoelec . . . " *Id.*  By operation of simple math, Defendants admit that they own a Corpoelec receivable worth approximately US$216.7 million.[6]

In addition to this receivable, IMPSA has a claim against Corpoelec in connection with these contracts.  IMPSA values that claim at ARG$1.7 billion or approximately US$130.3 million.  *Id.*  IMPSA is pursuing negotiations with Corpoelec for payment and believes that payment will be forthcoming.  *Id.*

---

[5] At times, IMPSA reports that Corpoelec's obligations equal 78.995% of IMPSA's outstanding receivables.  Harrington Decl. ¶ 14, Ex. N.  At other times, IMPSA reports that Corpoelec's obligations equal 80.31% of the outstanding receivables.  *Id.*

[6] The contracts appear to contemplate payment to IMPSA with a combination of U.S. dollars and Bolivarian pesos.

These amounts owed by Corpoelec to IMPSA have the potential to satisfy the IDB's
$168 million judgment.  All of these contractual or other legal rights to payment from Corpoelec
constitute "personal property" of IMPSA and are subject to a turnover order under N.Y. C.P.L.R.
5225(a).  The definition of "personal property" is broadly defined under this statute and
encompasses, among other things, "any debt, which is past due or which is yet to become due" or
"any property which could be assigned or transferred, whether it consists of a present or future
right . . . ."  N.Y. C.P.L.R. 5201(a)-(b).

It is well-settled in New York courts that such contract rights are property that can be
assigned and attached.  In *ABKCO Indus. v. Apple Films*, the Court found that the interest in a
licensing agreement, under which the judgment debtor would receive net profits from the future
promotion of a film, was intangible personal property under N.Y. C.P.L.R. 5201 that could be
assigned.  39 N.Y.2d 670, 674-75 (1976).  Although the value of the property was uncertain, the
Court found that this had "no legal effect on the validity of the attachment" given that the
property had "real economic significance."  *Id.* at 675-76.  Following *ABKCO*, New York state
and federal courts have found a broad range of contract rights to constitute attachable property,
including:  (1) ownership interest in twenty-two out of state limited liability companies, *Hotel 71
Mezz Lender LLC v. Falor*, 14 N.Y.3d 303, 314 (2010); (2) money received from a contractual
revenue stream, *In re Gaming Lottery Sec. Litig.*, No. 96 CIV. 5567, 2001 WL 123807, at *4
(S.D.N.Y. Feb. 13, 2001); and (3) an arbitration claim against a foreign government, *Motorola*,
739 F. Supp. 2d at 641.  IMPSA's right to receive payments from Corpoelec falls squarely within
the category of rights which may be used to satisfy the judgment.

As with Defendants' cash and cash equivalents, it is irrelevant that IMPSA's contract
rights may be located outside of the United States.  *Motorola*, 739 F. Supp. 2d at 641 (assigning

arbitration claim against Government of Turkey).  The Court has the power to order Defendants to turn over any property to an appropriate custodian in New York given that the Court already has jurisdiction over the judgment debtors.

**B.      The Court Should Appoint A Receiver Who Can Realize Upon The Corpoelec Contract.**

The IDB further requests that all rights to payment from Corpoelec or claims under IMPSA's contract with Corpoelec be assigned to a court-appointed receiver.  New York state law empowers this Court to "appoint a receiver who may be authorized to administer, collect, improve, lease, repair or sell any real or personal property in which the judgment debtor has an interest or to do any other acts designed to satisfy the judgment."  N.Y. C.P.L.R. 5228(a); *see also* Fed. R. Civ. P. 66.  In deciding whether the appointment of a receiver is warranted, courts have considered the following factors:  "(1) alternative remedies available to the creditor . . . ; (2) the degree to which receivership will increase the likelihood of satisfaction . . . ; and (3) the risk of fraud or insolvency if a receiver is not appointed."  *Coscia v. Eljamal*, 8 N.Y.S.3d 882, 885 (N.Y. Sup. Ct. 2015), quoting *Hotel 71 Mezz*, 14 N.Y.3d at 317; *see also Spotnana, Inc. v. Am. Talent Agency, Inc.*, No. 09 CIV. 3698 LAP, 2013 WL 227546, at *5 (S.D.N.Y. Jan. 22, 2013).

The Court should appoint a receiver here because it is superior to the statutory alternative – namely, transfer of the judgment debtor's contractual interest to the U.S. Marshals Service for public sale.  There is no readily available market for the right to payment from Corpoelec.  Such rights cannot easily be sold at a public auction.  By contrast, a receiver can take appropriate steps to collect on the Corpoelec contracts, thereby maximizing their value.  Courts have long recognized that appointment of a receiver is warranted in such situations:  "A receivership has been held especially appropriate when the 'property interest involved is intangible, lacks a ready market, and presents nothing that a sheriff can work with at an auction'. . . ."  *Gasser Chair Co.,*

*Inc. v. Infanti Chair Mfg. Corp.*, No. 03 CV 6413 (ILG), 2006 WL 297451, at *4 (E.D.N.Y. Feb. 8, 2006), quoting Siegel, New York Practice, § 512 (2004) (appointing receiver for purposes of selling a patent "and distributing the proceeds of the sale to plaintiffs to satisfy all or part" of a judgment); *see also United States v. Vulpis*, 967 F.2d 734, 736 (2d Cir. 1992) ("Under New York law, a receivership to sell the judgment debtor's property is appropriate when, in the judgment of the court, a public auction is inadequate . . . because it is unlikely to produce significant bids . . .") (citations and quotations omitted).

A receiver would moreover better be able to address any complexities arising from the financial structure of the contracts. *Hotel 71 Mezz*, 14 N.Y.3d at 317 (affirming argument that receiver "is warranted due to the complexity of defendants' intangible ownership interests. . . ."). In short, a receiver could maximize the value of those contract rights to benefit the IDB and all other stakeholders. *Spotnana*, 2013 WL 227546, at *6 (finding that receivership will "increase the likelihood of satisfaction given that [judgment debtor] continues to generate revenue.").

The IDB respectfully requests that the Court consider appointing retired U.S. District Court Judge Barbara S. Jones as a receiver for this matter with full authority to collect on and distribute proceeds from all assigned contract rights. Ms. Jones has substantial experience directly relevant to that task. *See* Harrington Decl. ¶ 19, Ex. T. She is well-situated to be an independent fiduciary here given that neither she nor her law firm represents the IDB on any matter. She has also confirmed that she is available to undertake this receivership.

The Court should order Defendants to execute any assignment document required in order to effectuate transfer of their contract rights and claims to Ms. Jones. In order "to effect payment or delivery" of money and/or personal property as described in N.Y. C.P.L.R. 5225(a), the Court may "order any person to execute and deliver any document necessary." N.Y.

16

C.P.L.R. 5225(c).  This provision empowers courts to execute whatever instruments are necessary to effectuate the property transfer or assignment.  *See Gryphon*, 836 N.Y.S.2d at 11 (requiring judgment debtor "to execute appropriate instruments enabling the sheriff to realize on respondent's right, title and interest in various stocks" pursuant to N.Y. C.P.L.R. 5225(c)) (internal quotations omitted).

The IDB therefore submits that the Court should appoint Ms. Jones as receiver, order IMPSA to execute any documents necessary to assign to her any rights to payment from Corpoelec, and authorize Ms. Jones to realize upon those contracts to satisfy the IDB's judgment with any remaining balance refunded to IMPSA.

## III.   THE COURT SHOULD ISSUE AN INJUNCTION PROHIBITING DEFENDANTS FROM INTERFERING WITH THESE ORDERS.

Finally, the IDB requests that this Court issue a permanent injunction prohibiting Defendants and other persons who are in active concert or participation with Defendants from making, causing or facilitating the transfer of funds currently in Defendants' possession or that are otherwise due on the Corpoelec contract to anyone other than the IDB or the Court-appointed receiver, respectively.  The Court may issue permanent injunctions pursuant to Fed. R. Civ. P. 65(d) and the Court's inherent equitable powers.  Fed. R. Civ. P. 65(d); *Grupo Mexicano de Desarrollo S.A. v. All. Bond Fund, Inc.*, 527 U.S. 308, 318-19 (1999) ("[T]he substantive prerequisites for obtaining an equitable remedy as well as the general availability of injunctive relief are not altered by Rule 65 and depend on traditional principles of equity jurisdiction.") (internal citations and quotations omitted).  The injunction should extend to Defendants, their affiliates and any person acting in concert or participation with them.  *NML Capital, Ltd. v. Republic of Argentina*, 727 F.3d 230, 243 (2d Cir. 2013) ("Every injunction issued by a district court automatically forbids others—who are not directly enjoined but who act 'in active concert

or participation' with an enjoined party—from assisting in a violation of the injunction."); *see* Fed. R. Civ. P. 65(d)(2)(C) (an injunction binds "other persons who are in active concert or participation with" the subject of the injunction).  It is appropriate for courts to employ this equitable power to issue permanent injunctions in aid of judgment enforcement.  *NML Capital, Ltd. v. Republic of Argentina*, 699 F.3d 246, 255 (2d Cir. 2012) (affirming issuance of injunction prohibiting party from altering process by which it makes payments on certain debts in judgment enforcement proceeding).

To show its entitlement to such an injunction, the IDB must demonstrate the following: "(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction."  *Entergy Nuclear Vt. Yankee, LLC v. Shumlin*, 733 F.3d 393, 422 (2d Cir. 2013) (internal citations and quotations omitted). The IDB meets these requirements.

First, the IDB will suffer irreparable injury absent an injunction.  Defendants have already shown an unwillingness to comply with U.S. law through their unexplained failure to comply with post-judgment discovery requests.  Defendants may also be transferring cash without Court permission in potential violation of N.Y. C.P.L.R. 5222.  Case law recognizes that the irreparable injury standard is met where the evidence indicates that judgment debtors have undertaken efforts to frustrate the judgment against them.  *See Yukos Capital S.A.R.L. v. OAO Samaraneftegaz,* No. 10 CIV. 6147 PAC, 2014 WL 81563, at *3 (S.D.N.Y. Jan. 9, 2014), vacated and remanded on other grounds, 592 F. App'x 28 (2d Cir. 2015) (irreparable harm standard met "when a judgment debtor transfers funds to frustrate a judgment"); *Pashaian v.*

*Eccelston Props., Ltd.*, 88 F.3d 77, 87 (2d Cir. 1996) (irreparable harm standard satisfied where case "involves completed actions to frustrate a judgment"); *Motorola Credit Corp. v. Uzan*, 978 F. Supp. 2d 205, 215 (S.D.N.Y. 2013) (finding irreparable harm where, "[g]iven the [defendants'] history of secreting assets away from [plaintiff's] efforts to collect on its judgment, it is doubtless the case that, should the freeze be released, no assets would remain for [plaintiff] to restrain or execute upon").

Second, the IDB has no alternative remedy at law. As controlling precedent has held, "[m]onetary damages are an ineffective remedy" where, as here, Defendants "will simply refuse to pay any judgments." *NML Capital*, 699 F.3d at 262. Defendants have made plain that they have no intention to pay the money judgment.

Third, the balance of equities favors the IDB. The IDB is already out of pocket the full amount that it loaned to Defendants' affiliate. Defendants have had the benefit of the loan's proceeds for years. Given that Defendants' own financial statements confirm their ability to make good on their promised payments, the balance of the equities supports enjoining them to ensure compliance with their obligations under U.S. law.

Fourth, the public interest is served by a permanent injunction. As a general matter, "[t]he public has an interest in the enforcement of judgment." *State Farm Mut. Auto. Ins. Co. v. Am. Rehab And Physical Therapy, Inc.*, 376 F. App'x 182, 184 (3d Cir. 2010). The public interest is particularly strong here given the nature of IDB's mission. Any recovery here will give the IDB the wherewithal to issue new financing to worthwhile development projects in the Caribbean and Latin America.

## CONCLUSION

For all the foregoing reasons, the IDB respectfully requests that the Court issue an order (1) directing Defendants to immediately pay to the IDB the sum of ARG$73.5 million;

(2) appointing Barbara S. Jones as receiver in this matter with full authority to collect upon and enforce the Corpoelec contract; (3) directing IMPSA to immediately assign any and all rights to payment under the Corpoelec contract, including any claims against Corpoelec arising out of that contract, to the receiver and to deliver all such assignment documents to the receiver;

(4) enjoining Defendants, their affiliates and any persons acting in concert with them from taking any steps to cause payments under the Corpoelec contract to be made to anyone other than the receiver or taking any steps to cause the transfer of cash or cash equivalents that Defendants possess or in which they have an interest to anyone other than the IDB without advance Court permission.

RICHARDS KIBBE & ORBE LLP
David W. T. Daniels (ddaniels@rkollp.com)
Jeffrey A. Lehtman (jlehtman@rkollp.com)
Portrait Building, 701 8th Street, N.W.
Washington, DC  20001-3727
Tel:  (202) 261-2960

Katherine Kern Harrington (kharrington@rkollp.com)
Maria E. Lapetina (mlapetina@rkollp.com)
200 Liberty Street
New York, New York 10281-1003
Tel:  (212) 530-1800

*Attorneys for Plaintiff Inter-American Development Bank*